## NATIONAL LABOR RELATIONS BOARD v. ROCKAWAY NEWS SUPPLY CO., Inc.

No. 208, Docket 22252.

United States Court of Appeals, Second Circuit.

Argued April 10, 1952.

Decided May 12, 1952.

Clark, J., dissented.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Frederick U. Reel, and Marvin E. Frankel, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Bandler, Haas & Kass, New York City, for respondent.

Before CHASE, MARIS, and CLARK, Circuit Judges.

MARIS, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board. The

Board found that respondent, Rockaway News Supply Co., Inc., had violated Sections 8(a) (1) and (3), 29 U.S.C.A. § 158 (a) (1, 3) of the National Labor Relations Act by discharging an employee because of his refusal to cross a picket line at a plant which his duties required him to enter. The undisputed facts upon which this finding is based may be summarized as follows:

Charles Waugh, the employee whose discharge on March 7, 1950, gives rise to this proceeding, had been employed by respondent as a chauffeur and routeman for about seven years. He was a member of the Newspaper and Mail Deliverers' Union of New York and Vicinity, which had for some years been contractually recognized by respondent as the exclusive bargaining representative of its employees. Working five days a week (Tuesdays through Saturdays), from 9:45 a. m. to 6:30 p. m., Waugh's duties consisted of driving a truck along a regularly assigned route and picking up and delivering various newspapers and other publications. Among his scheduled stops was one at the plant of The Daily Review Corporation, Rockville Center, Long Island, New York, publisher of the Nassau Daily Review Star. Before 10:30 a. m. on each working day, except Saturday, Waugh was required to pick up a supply of Review Stars for delivery at subsequent points on his route. This operation consumed about 10 or 15 minutes of each day.

On the morning of Thursday, March 2, 1950, before beginning work, Waugh learned that the Nassau County Typographical Union had placed pickets before the premises of The Daily Review Corporation. He then went to his foreman and told him that he, as a union man, would not cross that union picket line and thereby become a "scab" or a strikebreaker. The foreman suggested that he should not take that attitude, it might mean his job. But Waugh reiterated his position and suggested that copies of the Review Star be brought out to him in some way which would not entail his crossing the picket lines.

Respondent arranged to have its consignment of Review Stars brought on that day to its plant at Valley Stream, from which point Waugh took them and proceeded on his route as usual. Again on the next day, Friday, March 3, respondent had the papers brought by another of its employees to Waugh outside the picket line. On Tuesday, March 7, however, the next day on which Waugh's duties included picking up copies of the Review Star, his foreman told him that arrangements like those of the preceding Thursday and Friday would not be made and that respondent expected him to cross the picket line. "Otherwise," said the foreman, "you are fired; if you refuse, you are fired." Persisting in his refusal to cross the picket line, Waugh left respondent's premises. On the following day, Waugh returned seeking to be rehired but the foreman told him that he couldn't hire him, he had been fired. On each succeeding day for about three weeks Waugh appeared at the respondent's plant but was not rehired.

On April 7, 1950 Waugh filed a charge and on November 8, 1950 the General Counsel of the Board issued a complaint against the respondent. After a hearing before a trial examiner and an intermediate report by him the Board filed its decision holding that Waugh had a right, guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157, to refuse to cross the picket line and that accordingly his discharge was in violation of Sections 8(a) (1) and (3) of the Act. Accordingly the Board entered an order which required respondent to cease and desist from (1) interfering with, restraining, or coercing its employees in the exercise of their right to assist the Typographical Union, or any other labor organization, and their right to engage in, or refrain from, other concerted activities and (2) discouraging activity on behalf of and membership in the Typographical Union, or any other labor organization, by discriminating in regard to the hire or tenure of its employees. Affirmatively, the order required respondent to reinstate Waugh with back pay, to make available to the Board necessary records bearing on Waugh's right to reinstatement and back pay, and to post appropriate notices. 95 N.L.R.B.

■ It will thus be seen that this case squarely presents the question whether it is an unfair labor practice for an employer.

to discharge an employee who refuses to obey the employer's orders to perform that part of his regular daily duties which involve his crossing the picket line of another union than his own at another plant than that of his employer. In considering this question we accept the contention of the Board that the refusal of an employee to cross a picket line of another union than his own at another plant than that of his employer is an exercise of "the right to * * * assist labor organizations * * * and to engage in other concerted activities for the purpose of * * * mutual aid or protection," which is expressly guaranteed by Section 7 of the Act. Such refusal to cross a picket line is habitual with union workers as this court has recently pointed out,[1] it is frequently of assistance to the labor organization whose picket line is respected, and it is in a broad but very real sense directed to mutual aid or protection.[2] But accepting the proposition that the refusal of an employee to cross a picket line is a right guaranteed by Section 7 of the Act does not answer the question which this case poses. For, as the Supreme Court pointed out in Republic Aviation Corp. v. National Labor Relations Board, 1945, 324 U.S. 793, 798, 65 S.Ct. 982, 985, 89 L.Ed. 1372:

> "Like so many others, these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee."

It was in recognition of this limitation upon the rights guaranteed by Section 7 that the Board itself in its decision in Peyton Packing Company, Inc., 1943, 49 N.L.R.B. 828, 843, said:

> "The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employ-

er to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose."

It is true that in the Peyton Packing Company case the Board found that the union solicitation for which the employees were discharged, although occurring on the company's premises, had taken place on the employee's time before or after work or during luncheon or rest periods and not during their working time. It accordingly held their discharges to be in violation of Section 8(1) of the Act. The distinction which the Board has thus made between an employee's activities on his own time, even though on his employer's premises, and his activities during his actual working time is a sound and reasonable one and has been upheld by the courts.[3]

■ In the cases to which we have referred the distinction between union activities by an employee during working time in violation of the employer's rules and such activities on the employee's own time was applied to the soliciting of union memberships in the plant. The right to assist a union of which one is not a member by refusing to cross its picket line is certainly of no higher dignity or importance to the individual than the right to ask his fellow workers in his own plant to join with him in the union of which he is a member in concerted activities which will directly protect or aid in promoting their common interests. We think that the former is subject to the same limitations as the latter. In other words an employee is of course free to exercise his right to refuse to cross a picket line when he is on his own time and his discharge for so doing would doubtless be a violation of Section 8(a) (1). But he is not free to exercise the right during his working time in violation of his employer's working rules by refusing to per-

---

1. National Labor Rel. Bd. v. Service Trade Chauffeurs, etc., 2 Cir., 1951, 191 F.2d 65, 68.
2. National Labor Rel. Bd. v. Peter C. K. Swiss Choc. Co., 2 Cir., 1942, 130 F.2d 503, 505-506.

3. Republic Aviation Corp. v. National Labor Relations Board, 1945, 324 U.S. 793, 803, 65 S.Ct. 982, 89 L.Ed. 1372; National Labor Relations Bd. v. Illinois Tool Works, 7 Cir.1946, 153 F.2d 811, 814.

form that part of his regular duties which requires him to cross the picket line:[4] To hold otherwise would be to permit an employee unilaterally to dictate the terms of his employment which it is well settled he may not do.[5]

The Board in its decision in this case stated:

"Although Waugh's refusal to cross the picket line was a protected activity, the Respondent, as a normal incident of its right to maintain its operations, could have required Waugh to elect whether to perform all his duties or, as a striker, to vacate his job and make way for his replacement by the Respondent."

It will be noted that the Board here concedes that the Respondent could have required Waugh to cross the picket line or "vacate his job." But by vacating his job the Board seems to mean going out on strike rather than resigning. We cannot follow the Board's reasoning. For Waugh had no grievance against the respondent nor any economic demands against it which a strike on his part might have enforced. On the contrary, if he had gone on strike it could only have been to assist the striking members of the Typographical Union at the Daily Review Corporation plant by seeking to force his employer not to deal with that corporation. If Waugh's union had supported him in such a strike it would have been a secondary strike and as such would have been an unfair labor pactice on the part of the union, under Section 8(b) (4) [6] of the Act as amended by the Taft-Hartley Act.

It is true, as the Board points out, that by virtue of the proviso to Section 8(b)(4) Waugh's individual refusal to cross the picket line cannot be regarded as a violation of the Act or as convicting his union of an unfair labor practice. But the fact remains that the strike which the Board suggests the respondent could, and we gather

---

4. We do not have here a case in which the order to cross the picket line was a discriminatory order enforced against a union employee in order to prejudice him by reason of his union membership. Such a situation would, of course, involve other considerations.

5. C. G. Conn, Limited v. National Labor Relations Board, 7 Cir., 1939, 108 F.2d 390, 397; National Labor Relations Bd. v. Montgomery Ward & Co., 8 Cir., 1946, 157 F.2d 486, 496; National Lab. Rel. B. v. Kopman Woracek Shoe Mfg. Co., 8 Cir., 1947, 158 F.2d 103, 108.

6. "Sec. 8(a) * * *
"(b) It shall be an unfair labor practice for a labor organization or its agents—
* * * * * *
"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer. or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9; (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9; (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: *Provided*, That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act."

it thinks should, have compelled Waugh to undertake would have been an unlawful one if he had gotten any support in it from his own union. And the fact that Waugh's act in refusing to perform that part of his duties which involved crossing the picket line was not a violation of the National Labor Relations Act does not make it any the less a violation of his obligation to his employer to perform the duties of his employment or any the less a proper basis for his discharge for failure to do so.

We think that the Board is wholly unrealistic in the distinction which it seeks to make between the discharge of Waugh for refusing to carry his newspapers across the picket line, which it stamps as unlawful, and the suggested replacement of him as a striker after he had been compelled to vacate his job for refusing to do so, which it thinks would have been perfectly all right. For once Waugh had gone out on his one-man strike against the respondent his place could unquestionably have been filled and his name could then have been dropped from the respondent's payroll under settled principles of law applicable to the replacement of strikers engaged in a strike not involving unfair labor practices.[7] Moreover it is inconceivable that Waugh could have won his strike in view of the fact, already adverted to, that any assistance to him by any union would under Section 8(b)(4) have been an unfair labor practice which it would have been the duty of the Board to prevent.

We need only add that we have assumed in reaching our conclusion in this case that Waugh's refusal to cross the Typographical Union's picket line was intended by him to aid that labor organization. On the evidence in this case that fact is very doubtful, however. For the evidence indicating that Waugh's only concern appeared to be with his own standing as a union man. He stated that he did not want to become known as a "scab" or strike breaker by crossing a picket line. He had no intention to aid the picketing union by

refusing to handle the newspapers which were being produced in the picketed plant. On the contrary it is undisputed that he readily handled and distributed these newspapers on the two days when they were brought to him across the picket line by a fellow employee who apparently did not have the same compunctions.

We conclude that the respondent was not guilty of an unfair labor practice in discharging Waugh. We are supported in this conclusion by the decision of the Court of Appeals for the Seventh Circuit in National Labor Relations Board v. Illinois Bell Tel. Co., 1951, 189 F.2d 124, certiorari denied 342 U.S. 885, 72 S.Ct. 173, in which that court reached the same result upon substantially similar facts. Since Waugh's discharge was the sole basis for the Board's conclusions and order it follows that the order must be denied enforcement and set aside.

The petition of the National Labor Relations Board for the enforcement of its order will be denied and the order will be set aside.

CLARK, Circuit Judge (dissenting).

While the Taft-Hartley Act reversed the trend toward unionism fostered by the Wagner Act, it did so by bringing the employer also within the aegis of administrative agency protection, and not by reversion to *laissez faire*. So Congress expressly preserved much of the former statutory protections of the unions, such as the right to strike, § 7, 29 U.S.C.A. § 157. And when it limited the weapon of the boycott it took pains to except from the newly defined unfair labor practices of a union or its agents the crossing of a picket line. Sec. 8(b)(4), 29 U.S.C.A. § 158(b)(4), final sentence, as quoted in note 6 of the opinion. The adoption of this Act was bitterly contested, as is well known; its provisions therefore should be taken as representing the utmost position for which either side could muster sufficient support to obtain the final legislative endorsement. There is thus less reason than

7. National Labor Relations Board v. Mackay Co., 1938, 304 U.S. 333, 345–346, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 1942, 130 F.2d 919, 928; National Labor Relations Board v. Globe Wireless, 9 Cir., 1951, 193 F.2d 748, 750.

usual to extend the prohibitions of the Act by implication. Rabouin v. N.L.R.B., 2 Cir., 195 F.2d 906.

When, therefore, the Board acts in what seems to me the intended spirit of this specific § 8(b)(4) exception to hold that a union member does not lose the statutory protection by refusing to cross a picket line, I do not see how we can rule that action erroneous as a matter of law. Note that here we are not faced with the question whether or not the Board could have found some violation in all the circumstances; on the contrary we are holding it under legal compulsion so to find. The extent of the step we are taking in thus promulgating a rigid rule of law is highlighted by the authorities relied on. An abstract statement of rights as offset by duties, made by the Supreme Court in 1945, Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 798, 65 S. Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081, and a tentative—but not enforced—suggestion of the Board in 1943 that an employer might make and enforce "a rule prohibiting union solicitation during working hours," Peyton Packing Co., Inc., 49 N.L.R.B. 828, 843, are employed to restrict this explicit and unlimited exception of the 1947 Act to *only non-working hours.* To say that a workman is protected from discharge for refusing to cross a picket line only when his refusal is outside of his working hours— here from 9:45 a. m. to 6:30 p. m.—seems to me a practical nullification of the statutory provision. That, by the way, was not discussed in N.L.R.B. v. Illinois Bell Tel. Co., 7 Cir., 189 F.2d 124, supra, because the situation there arose before the enactment of the Taft-Hartley Act.

The opinion does not rely at all on any suggestion that Waugh was violating a service contract; that issue, I believe, has thus been properly removed from the case.[1] But with that eliminated, all that is left to support the conclusion negating the statutory exception is, it seems to me, an argument that any prohibition against discharge is unreal in view of the settled right in the employer in an "economic" or competitively justified strike to keep his business going by replacing the strikers. If unreal in this case, it must be considered equally so in all cases of economic strikes. But for good or ill, the distinction is quite settled, not newly developed here, and, following its history beginning with N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345–346, 58 S.Ct. 904, 82 L.Ed. 1381, seems quite natural. It was applied by us in N.L.R.B. v. Remington Rand, Inc., 2 Cir., 130 F.2d 919, 928, and is explained succinctly and clearly in N.L.R.B. v. Globe Wireless, Ltd., 9 Cir., 193 F.2d 748, 750.

Accordingly I can see no legal basis for refusing enforcement of this Board order.

---

[1] Although the employer here strongly contended that a collective bargaining contract with the union so required, the Board had ruled the entire contract void because of an illegal union-security clause and, apparently, other defects. A test case on this issue is said to be pending on our calendar; but see Red Star Express Lines of Auburn, Inc. v. N. L. R. B., 2 Cir., 196 F.2d 78, where the Board was sustained in such a view of a union-security contract.